IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| KITTRENA L. MORGAN, | ) | CIVIL NO. 14-00551 SOM-BMK |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING IN PART AND |
| | ) | DENYING IN PART DEFENDANTS' |
| vs. | ) | MOTION FOR SUMMARY JUDGMENT |
| | ) | |
| COUNTY OF HAWAII; COUNTY OF | ) | |
| HAWAII POLICE DEPARTMENT, | ) | |
| HPD; OFFICER JEROME MANUEL, | ) | |
| INDIVIDUAL AND OFFICIAL | ) | |
| CAPACITY, DETECTIVE IAN | ) | |
| LEELOY, INDIVIDUAL AND | ) | |
| OFFICIAL CAPACITY, OFFICER | ) | |
| JOSIAH COE, INDIVIDUAL AND | ) | |
| OFFICIAL CAPACITY, OFFICER | ) | |
| STANLEY KAINA, INDIVIDUAL AND | ) | |
| OFFICIAL CAPACITY, SERGEANT | ) | |
| GEORGE MAKUA, INDIVIDUAL AND | ) | |
| OFFICIAL CAPACITY, OFFICER | ) | |
| CARRIE AKINA, INDIVIDUAL AND | ) | |
| OFFICIAL CAPACITY, AND OTHER | ) | |
| PERSONS INVOLVED IN THE | ) | |
| INCIDENT OF OCTOBER 25, 2012; | ) | |
| HAWAII POLICE COMMISSION; | ) | |
| DOES 1-10, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I.      **INTRODUCTION.**

Pro se Plaintiff Kittrena Morgan's civil rights complaint asserts federal and state court claims relating to her removal from land on the Big Island that she claimed a right to

live on.  Defendants move for summary judgment on all claims.

That motion is granted in part and denied in part.

II.        **BACKGROUND.**

The court has discerned certain relevant facts from the large record.  However, the court has no obligation to scour, and has not taken on the task of scouring, the numerous exhibits for facts that were not identified in the parties' concise statements of facts.  See Local Rule 56.1(f).  The court summarizes here what it understands to be the background of the case.

In 2009, Morgan began camping at Kawa Bay, where she met Abel Lui and became his girlfriend and "caretaker."  ECF No. 60-3, PageID #s 1028-31; ECF No. 99, PageID # 1495 (admitting Defendants' Concise Statement of Facts ("CS") ¶ 1).  At the hearing on the motion before this court, Morgan called herself Lui's "hanai" wife, using the Hawaiian term to describe her close family-like relationship that was not a marriage under state law. Lui had lived at Kawa Bay for about twelve years, even though it appears he did not have written title naming him as having an interest in the land.  He was arrested more than twenty times for simple trespass and criminal trespass.  ECF No. 99, PageID # 1495 (admitting CS ¶¶ 4-5).  Lui appealed one of those convictions up to the Intermediate Court of Appeals of Hawaii, which affirmed. See ECF No. 60-8.

The County of Hawaii purchased one of the lots at Kawa Bay in 2008, then purchased the remainder of the Kawa Bay land in 2011.  ECF No. 99, PageID # 1495 (admitting CS ¶¶ 6-7).

The County filed a Complaint for Ejectment in state court.  Plaintiff was joined as a party at her own request.  ECF No. 60-1, PageID # 938; ECF No. 99-60, PageID # 1947.  On September 7, 2012, the state court entered judgment in favor of the County and issued a writ of possession.  ECF No. 60-15, PageID # 1153.  Despite the court's ruling, Morgan, Lui, and others continued to camp at Kawa Bay, claiming to be exercising traditional Hawaiian rights and practices.  See ECF No. 99-1, PageID # 1502-03.

On October 25, 2012, officers from the Hawaii County Police Department and the State of Hawaii's Sheriff's Division served the writ of possession on Morgan, Lui, and others, telling them they had two hours to pack up their belongings and leave the beach.  ECF No. 99-1, PageID # 1503.  Morgan recalled, "Initially they said--initially they said, 'You have two hours to pack and leave.  If you don't leave in two hours then you'll be arrested and your cars would be towed.'  That's exactly what was told to us."  ECF No. 99-48, PageID # 1709.

The officers at the scene told the Kawa Bay occupants that anything they were not able to take with them would be removed and stored for thirty days.  Morgan took a video of a

3

part of her interaction with police that day.  See ECF No. 60-19.
The video shows the officers talking to Morgan firmly but calmly,
while Morgan can be heard becoming increasingly emotional and
agitated.  The record includes an uncertified transcript of
Morgan's video, which this court, having compared the transcript
against the video, cites here:

> Officer:   All right and your vehicle will be
>            towed from the property.  Ok and
>            it's just going to get more and
>            more complicated for you after
>            that.  All right?  Did you
>            understand what I just said? Ma'am
>            did you understand what I just
>            said.
>
> Morgan:    So you're asking us to just forfeit
>            all of Abel's belongings here?
>
> Officer:   No, I am not asking you to forfeit;
>            I'm asking you to leave on your own
>            accord.
>
> Morgan:    And then what about everything
>            that's here?
>
> Officer:   Well we just explained . . .
>
> Morgan:    what about the dying plants . . .
>            in the garden . . .
>
> Officer:   . . . What what we just explained
>            . . .
>
> Morgan:    . . . that the Hawaiian mans not
>            allowed to take care of for 30
>            days?  No!
>
> Officer:   . . . was that all of those
>            property all of the property
>            personal property that you don't
>            take with you ok will be collected
>            by UPW

4

Morgan:     No!

Officer:    and then will be . . . . stored . . .

Morgan:     No!

Officer:    Ma'am

Morgan:     You don't touch his stuff!

Officer:    It it will be collected by UPW . . .

Morgan:     Yeah

Officer:    and it will be stored.

Morgan:     Yeah and then he's supposed to pay . . .

Officer:    Kay and then . . .

Morgan:     . . . the storage to get it back and he's got no more money

Officer:    . . . and then it will be available for him to collect within 30 days. Ok that's what's going to happen.

Morgan:     It can't happen . . .

Officer:    It's gonna happen.

Morgan:     . . . there's not a big enough truck he's got a house full of his children's pictures up here.

Officer:    It's gonna happen.

Morgan:     . . . It can't happen.

Officer:    Ok, so I'm not gonna argue with you so you . . .

Morgan:     It can't happen.

Officer:     . . . the clocks ticking the clocks ticking and if you're not. . .

Morgan:      . . . It can't happen; there's no way.  All of Abel's . . .

Officer:     . . . if you don't show if you don't show any sign of compliance . . .

Morgan:      . . . belongings are in the house.

Officer:     . . . Ok that you're going to comply with the order all right there's uh that's going to uh trigger the next actions.  Ok and I haven't seen you complying with any of our directions yet, ok, and these are lawful directions coming from the court. [phone ringing] You understand what I'm saying?

Morgan:      I understand what you're doing is illegal.

Morgan:      [Speaking on telephone] Aloha. Yeah they're giving no ultimatum here they they've already kicked other people out of the beach, I believe, the surfers, and we're supposed to just leave everything and leave if we don't leave within which is like an hour and a half now the vehicles will be towed and he said anything left any personal belongings are going to be put into storage for thirty days.  How the hell are they gonna to pack up this camp?  How are they going to pack out Abel's house?

Officer:     You're wasting time.  You should . . .

Morgan:      He says oh I'm wasting time I've got to get moving packing.  This is like the most emotional distress

6

```
                    any one can inflict upon a human
                    being . . .

Officer:    You should be trying to show some
            compliance here . . .

Morgan:     [talking on the phone] Is there
            anyone to call to come down here?

Officer:    Can you show some compliance
            please?

Morgan:     They're just God . . . (wailing)

Officer:    It's a lawful lawful order from the
            courts we need your lawful comp we
            need your compliance ma'am ok?

Morgan:     Geez I don't know they took him he
            was showing him the watermelon in
            the garden it's his . . .

Officer:    We need your compliance ma'am.

Morgan:     First thought.  You know all of the
            plants are going to die; the three
            hundred ipu he had oh God.

Officer:    Ma'am we need your compliance
            please.

Morgan:     Yeah I so worried he went to talk
            to one of them.  I don't know.  He
            had the two kids from Arkansas who
            were staying at the beach that's
            the only campers . . .

Officer:    All right.

Morgan:     I don't know there was fisherman
            and surfers I guess they're all
            kicked out.  They're locking down
            the entire Kawa which cannot be
            legal and they can't make Abel
            leave like this.  Tell him in less
            than two hours and it's been a half
            an hour now.  No!  This is
            inhumane.  Ooh!
```

Officer:   We need you to . . .

Morgan:    God!  And he's standing like a foot
           from me and he keeps walking closer
           like . . .

Officer:   I'm about I'm about eight feet now
           . . .

Morgan:    Why this is sickening.  What are
           you going to do now?  The pain
           compliance of neck jabbing next?

Officer:   Neck jabbing?  That's not a
           technique we practice.

Morgan:    Oh that's a lie ask the Corporation
           Counsel and their submissions.  I'd
           better get off here; I gotta find
           Abel.  Please call somebody.

Officer:   . . . ma'am hang on hang on ma'am
           we need you to start complying.

Morgan:    They're the're saying I gotta yeah
           great . . .

Officer:   We need you start complying ma'am.

Morgan:    I'm complying I'm not touching you.
           Liko they're walking like a foot
           from me with their big freaking
           guns and threats I'm not complying
           cause I'm going to go find Abel.
           I'm in Abel's house here now and
           you didn't knock and enter.

Officer:   This is not a search warrant.

Morgan:    Liko please call somebody.

Officer:   This is not a search warrant,
           ma'am.

Morgan:    So Abel's gardening; that's what he
           does; he's going to be gardening.
           [sobbing]  That's what he does when
           he's stressed; he gardens.

8

```
Officer:    We need we need you to grab your
            personal effects and leave the
            area.

Morgan:     All of this is my personal effects.

Officer:    We need you to start grabbing your
            personal effects that you need . .
            .

Morgan:     Liko what can I do here?

Officer:    . . . immediately and leave the
            area . . .

Morgan:     Liko what can I do?

Officer:    You can grab your things and leave
            the area.

Morgan:     Call somebody.

Officer:    Ok, you need to grab your personal
            effects and leave the area.

Morgan:     Get away from!  Get away!

Officer:    We need you to leave the area
            Ma'am, grab your things.

Morgan:     [Attempts to blow a conch shell]

Female Officer: Ma'am we gave you the
            opportunity to take all of your
            stuff . . .

Morgan:     We can't.  There is no humanly way
            to take all of our stuff!

Female Officer:  We are here to help you.  We
            can help you break this tent down
            so you . . .

Morgan:     Ooh yeah, you can break the tent
            down!

Officer:    We can break it down.
```

9

Morgan:    Oh stop it I gotta.

Officer:   You're under arrest . . .

Female Officer:  Stop resisting put the . . .

Morgan:    I'm not resisting.

Officer:   You're under arrest.

Morgan:    Abel!  I'm not resisting!

Officer:   Put your hands behind behind your back.

Morgan:    I'm very upset.

Officer:   Behind your back.

Morgan:    Stop it; that's my chickens she's 18; come on I'm going to pack up.

Officer:   Hands behind your back.

Female Officer: . . . hands behind your back.

Morgan:    Please.

Officer:   . . . hands behind your back.

Female Officer: Put your hands behind your back.

Morgan:    No! I'm not doing anything bad.

Officer:   . . . hands behind your back.

Morgan:    I'm not doing anything bad.

Female Officer: You are actively resisting.

Morgan:    I'm actively resisting?  I didn't do anything to get arrested.  All of my stuff is here; my life is here, Abel.  Stop it!  I didn't do anything!  I didn't do anything! I'm going to get my stuff . . .

```
Female Officer: Put your hand, put your hand
              behind your back . . .

Morgan:   I'll get my stuff, ahhhh, fuck!

Female Officer: Put your hand . . .

Morgan:   Ahhhh!
```

ECF No. 60-19.

In later state court proceedings, Officer Stanley Kaina said that Morgan was told that the police were serving an eviction notice and that Lui and Morgan had two hours to gather up their belongings and vacate Kawa Bay.  See ECF No. 99-59, PageID # 1923.  Kaina recalled that Morgan was agitated and that, while talking on the phone, she went to the "kitchen" area of the tent structure she occupied.  That area contained knives and a conch shell that Morgan wanted to blow, apparently to call for help.  Id., PageID # 1923-24.  Kaina said that he was concerned about officer safety at that point because Morgan was moving things around; Kaina said he was uncertain whether Morgan might reach for an item that she could use to hurt the officers.  Id., PageID # 1925.

According to Kaina, Officer Carrie Akina at that point told Morgan that she was under arrest.  Id.  Akina testified in state-court proceedings that Morgan did not comply when told that, given her arrest, she needed to place her hands behind her back.  ECF No. 99-59, PageID #s 1849-50.

There was a small opening adjacent to Morgan's tent where Sergeant George Makua grabbed Morgan's arm.  Morgan pulled away from both Akina and Makua, causing Kaina to grab Morgan. Kaina says that because Morgan was screaming and he was concerned about Morgan's agitation, he "took her left leg out from under her."  Id., PageID # 1926.  Kaina says he "conducted the leg sweep in accordance with my training and safely placed Ms. Morgan on her stomach with the assistance of Officer Akina and Sergeant George Makua."  ECF No. 60-23, PageID # 1180.  Kaina explained, "I step to her left, outside of her left foot, and I assist by taking my left foot and placing it near her ankle and sliding it towards my right, which will in return throw her balance off and allow her to go to the ground.  But with Officer Akina and myself holding on to her arms, it wouldn't just drop her flat to the ground.  We would assist her to the ground."  ECF No. 99-59, PageID # 1931.  Officer Kaina says that Sergeant Makua assisted Akina and Kaina in "placing" Morgan on the ground.  See ECF No. 60-23, PageID # 1180.

Akina's actions are inconsistently described.  Akina testified in 2013 in state court that she did not know how Morgan ended up on the ground.  See ECF No. 99-59, PageID # 1851. However, in connection with the present motion, Akina says that she and Kaina "escorted Ms. Morgan to the ground."  ECF No. 60-25, PageID # 1191.

12

While the police describe the leg sweep and Morgan's take down as if little force was involved in getting Morgan to the ground, Morgan says her face was "smashed" into the ground. ECF No. 60-3, PageID # 1043.  Morgan's video does not actually show the leg sweep or Morgan's face hitting the ground, but the camera appears to have fallen to the ground quickly.  The court cannot tell from the video whether Morgan was still holding the camera when she fell to the ground or whether she dropped it.

Akina says that while Morgan was on the ground and Akina was trying to put metal handcuffs on her, Morgan was kicking her feet about and trying to scratch Akina.  Akina says it took both her and Officer Kaina to handcuff Morgan.  According to Akina, the metal handcuffs she put on Morgan were "in a double-locked setting so that they would not get any tighter on her wrists."  ECF No. 60-25, PageID #s 1191-92.  Kaina says that he applied pressure to Morgan's back and arms using his body weight to straighten Morgan's body so that the handcuffs could be put on Morgan.  ECF No. 60-23, PageID # 1180.

Morgan acknowledges that she resisted the officers' attempt to arrest her, see ECF No. 99-60, PageID #s 1962-65, but explains that she "was afraid for Abel's life, and I knew there was no reason for me to get arrested."  ECF No. 99-60, PageID # 1964.

Morgan was initially arrested for criminal trespass and resisting arrest after being served with the notice of ejectment. ECF No. 99-59, PageID # 1851, 1861.  Morgan says that, although she was "severely distraught, emotional, [and] verbally 'interruptive,'" she was only trying to educate the officers about her right to be on the beach.  See ECF No. 99-1, PageID # 1504.

After her arrest, Morgan was carried by three officers to the transport van; Officers Akina and Kaina held Morgan's arms while Sergeant Makua held her feet.  ECF No. 99-59, PageID # 1882.  Akina testified that Morgan was "flailing about" while being carried.  Id., PageID # 1854.

Morgan characterizes the handcuffs as a form of "torture."  ECF No. 99-1, PageID # 1504.  She believes her legs were zip-tied together before she was carried to the van.  ECF No. 99-60, PageID # 1967.  Although Morgan said she was told by witnesses that she had been "hogtied," she conceded at the hearing that that description might not have been intended as saying that her wrists had been tied to her ankles.

Officer Akina testified that the police only put plastic ties on Morgan's ankles after they set her down next to the police vehicle.  Akina said that Morgan's ankles were not restrained while Morgan was carried.  ECF No. 99-59, PageID #s 1881, 1941-42.

14

At the hearing before this court, Morgan said that an unknown officer drove her from the beach to a road. The officer then stopped the car and left Morgan in the hot vehicle with the windows rolled up for about ten minutes. ECF No. 99-1, PageID # 1505.

Akina says that, in the meantime, Akina drove Morgan's own vehicle to the road. Akina then asserts that she went over to Morgan and checked the metal cuffs, determining that "they were applied properly and not too tight." ECF No. 60-25, PageID # 1193. Akina says she ultimately removed the metal cuffs and substituted "plastic, flexi-cuff type handcuffs" because the metal cuffs belonged to Akina and Akina understood that Morgan was about to be transported to the Kona Police Station by Officer Jerome Manuel and Officer Josiah Coe. Id.

Officer Manuel heard Morgan complain that the flexicuffs were too tight. ECF No. 60-20, PageID # 1166. Officer Coe says he saw Officer Akina put her finger inside the flexicuffs to confirm that they was not too tight. Coe says he also "carefully inspected her cuffs and noticed that there were neither red marks nor discoloration of any kind on her wrists." ECF No. 60-30, PageID # 1262.

Before the police van left the beach for the police station, Morgan asked for medical assistance because her forehead was sore and she was worried that she was bleeding. Medics

15

examined her, told her that there appeared to be no visible injuries, and said she was okay for transport.  ECF No. 99-60, PageID # 1974.

Although Morgan testified that she was not told that she was being arrested and feared that she was being kidnapped, see ECF No. 99-60, PageID # 1975, the video taken by Morgan reflects that she was indeed told that she was being arrested. See ECF No. 60-19.

Morgan says that, while being driven to the police station by Officers Manuel and Coe, she was "crying loudly in unbearable pain from the severely tight 'flexicuffs.'"  ECF No. 99-1, PageID # 1505-06.  She says that Officer Manuel called her a "liar" and said that he had personally checked the cuffs with two fingers, as he gestured up and down with his fingers.  Id. Morgan characterized the flexicuffs as being tourniquets that caused her wrists to become swollen and numb.  Id.  According to Morgan, when they arrived at the police station, Officer Manuel brushed his arm against her breasts as he undid her seatbelt. Id.

Officer Manuel characterizes the drive differently. Manuel says that Morgan complained that the flexicuffs were too tight, but, having seen Officer Akina confirm that the cuffs were not too tight, Manuel told Morgan that the officers would not stop the vehicle to address her complaint.  ECF No. 60-20, PageID

16

# 1167.  Manuel denies that he touched Morgan inappropriately and says he made no gesture that was sexual in nature.  Id.  Manuel and Coe both say that, during the ride, Morgan told Coe that Morgan hoped Coe would get cancer and said, "I hope you die, too."  Id.; ECF No. 60-30, PageID # 1262.

When Morgan was at the police station, officers attempted to take off the flexicuffs.  Morgan struggled with the officers to prevent them from doing so.  According to Morgan, she was "screaming," "Please, anyone in this police department, please come witness this."  Morgan says that, even though she was in "extreme" pain caused by the flexicuffs, she did not want the evidence cut off.  ECF No. 99-60, PageID #s 1977-78.  Morgan says that officers denied her requests to have "a female to be present . . . [to] verify how tight the cuffs were, and to see the officer in charge."  ECF No. 99-1, PageID # 1506.  Morgan testified in her deposition in this case that she asked for a female officer because she was uncomfortable being alone with Officers Manuel and Coe after Manuel had allegedly brushed his arm against her breasts.  ECF No. 99-60, PageID # 1977.

Dennis Martin, a sheriff, was at the police station at the time.  He says that he saw Morgan pulling on the cuffs, inflicting pain on herself.  ECF No. 60-35, PageID # 1275.  Eventually, Officers Manuel and Coe were able to cut off the flexicuffs and use metal cuffs to secure Morgan to a wooden

bench.  Morgan then allegedly blurted out, "I'm going to say that you touched my breasts."  ECF No. 60-20, PageID #s 1167-68.

Morgan says she asked someone in the booking room to call a medic, but the person refused.  ECF No. 99-60, PageID #s 1977-78.  Officer Manuel says he told Morgan that a medic would be called after the booking process was completed.  ECF No. 60-20, PageID # 1168.

Morgan says that she was denied a phone call and that Officer Manuel told her that Abel Lui was coming to pick her up, when, in fact, Lui was not coming to pick her up.  Id., PageID # 1506.  Morgan also says that during the booking process Officer Manuel told her, "You just like to fuck Hawaiians."  Id., PageID # 1507.  At the hearing before this court, Morgan explained that this alleged comment reflected Manuel's negative view of her relationship with Lui, who is native Hawaiian (as opposed to reflecting the use of the work "fuck" to mean "harm").

Officer Manuel says that after booking was completed, Morgan was given a court date and released.  ECF No. 60-20, PageID # 1168.  Morgan left the police station, but returned to tell the person at the front desk that she was in pain.  That person called medics, who arrived seven to ten minutes later.  Morgan says she showed them her swollen, sore hands and told them her back hurt.  Id., PageID #  1980.

Morgan was examined by Doctor Robin Seto later that
day.  Dr. Seto saw bruises on Morgan's wrists and head and
diagnosed her with a strained back, given the tenderness in the
lower L4 to L5 paralumbar muscle.  ECF No. 99-4, PageID # 1516.
Doctor Maria Patten saw Morgan on December 12, 2012, and noted
that Morgan "has had significant back pain since the incident,
and xrays have shown a mild L1 compression fracture of
indeterminate age."  ECF No. 99-4, PageID # 1524.  Morgan says
that, as a result of the incident, she suffered nerve damage to
her wrists and severe emotional distress.  ECF No. 99-1, PageID
# 1505.  She also says that, since her arrest, she has had
difficulty sleeping, has had frequent nightmares, and wakes up
crying almost every day.  Id., PageID # 1508.

According to Defendants' medical expert, Peter A.
Galpin, M.D., Morgan's medical records show that she suffered "an
industrial accident which included injuries to her neck.  In
2008, Ms. Morgan claimed aggravation of her 1993 injury.  Ms.
Morgan has a history of pre-existing degenerative disc disease in
her cervical spine at C5-6 and C6-7 and cervical radiculopathy
which resulted in numbness in the hands.  These injuries are more
than likely permanent cervical injuries."  ECF No. 100-7, PageID
# 2116.  Dr. Galpin also stated that, in his medical opinion, the
L-1 fracture is not an acute injury resulting from Morgan's

arrest, but rather "an old fracture or degenerative condition."
ECF No. 1007, PageID # 2117.

On November 13, 2012, a criminal complaint was filed in
state court alleging that Morgan had committed simple trespass
and resisted arrest at Kawa Bay on October 25, 2012.  See ECF No.
60-18, 1157.  Morgan was convicted of simple trespass on May 17,
2013.  ECF No. 60-3, PageID # 1035.

On December 5, 2012, Morgan filed a complaint with the
Police Commission regarding her arrest.  The complaint, No. HPC
12-47, was the subject of a meeting on March 15, 2013.  Before
the meeting, the matter was noted on the public agenda, with the
following description: "HPC 12-47: Complainant alleged that when
officers executed a writ of possession and ejection, they caused
her bodily injury and emotional distress, and an officer taunted
and laughed at her."  ECF No. 60-32, PageID # 1270.  Morgan says
that, when she went to the meeting, she was forced to fill out
her name and complaint number on a sign up sheet.  Morgan
provides a sample sign up sheet, but not the actual sheet she
signed.  ECF No. 99-38, PageID # 1605.  At the meeting, witnesses
for Morgan publicly disclosed her identity, referring to her as
"Kittrena."  See ECF No. 60-22, PageID #s 1174-75.

III.      STANDARD.

The burden initially falls on the moving party to
identify for the court those "portions of the materials on file

20

that it believes demonstrate the absence of any genuine issue of material fact." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted).

The nonmoving party must set forth specific facts showing that there is a genuine issue for trial. T.W. Elec. Serv., Inc., 809 F.2d at 630. At least some "'significant probative evidence tending to support the complaint'" must be produced. Id. (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290 (1968)). See Addisu, 198 F.3d at 1134 ("A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact."). "[I]f the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." Cal. Arch'l Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987) (citing Matsushita Elec. Indus. Co., 475 U.S. at 587). Accord Addisu, 198 F.3d at 1134 ("There must be enough

doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

All evidence and inferences must be construed in the light most favorable to the nonmoving party.  T.W. Elec. Serv., Inc., 809 F.2d at 631.  Inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. Id.  When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact."  Id.

## IV.      ANALYSIS.

### A.    Excessive Force.

In the First, Second, Eleventh, Twelfth, and Fourteenth Causes of Action, Morgan asserts § 1983 claims based on what she says was the Fourth Amendment violation committed by police officers when they allegedly used excessive force on the day they arrested her.  See ECF No. 1-2.

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of law.  West v. Atkins, 487 U.S. 42, 48 (1988).

The Fourth Amendment states:

> The right of the people to be secure in
> their persons, houses, papers, and effects,
> against unreasonable searches and seizures,
> shall not be violated, and no Warrants shall
> issue, but upon probable cause, supported by
> Oath or affirmation, and particularly
> describing the place to be searched, and the
> persons or things to be seized.

Courts analyze Fourth Amendment excessive force claims under the framework established by the Supreme Court in Graham v. Connor, 490 U.S. 386 (1989).

The authority to arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id. at 396.  Police officers "are not required to use the least intrusive degree of force possible," but only must act within a reasonable range of conduct. Marquez v. City of Phoenix, 693 F.3d 1167, 1174 (9th Cir. 2012) (quotation omitted).  The existence of an injury does not mean that a plaintiff's constitutional rights have been violated or that police officers used excessive force in arresting the plaintiff.  Instead, for Fourth Amendment purposes, "The question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." Graham, 490 U.S. at 397.

Under Graham, the reasonableness of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

23

hindsight."  490 U.S. at 396.  In other words, not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.  The calculus of reasonableness must allow for the fact that, in circumstances that are tense, uncertain, and rapidly evolving, police officers are often forced to make split-second judgments about the amount of force needed in a particular situation.  Id.  Whether an officer's actions were "objectively reasonable" should be determined without regard to the officer's underlying intent or motivation.  Id.

In the Ninth Circuit, the objective reasonableness inquiry under Graham involves a three-step analysis:  First, the court must assess the gravity of the particular intrusion on Fourth Amendment interests by evaluating the type and amount of force used.  Miller, 340 F.3d at 964.  Second, the court must assess the importance of the governmental interests at stake by considering the Graham factors: (a) the severity of the crime, (b) whether the suspect posed an immediate threat to the safety of the officer and others, and (c) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.  Id.  Third, the court must balance "the gravity of the intrusion on the individual against the government's need for that intrusion to determine whether it was constitutionally reasonable."  Id.  The Ninth Circuit has "held on many occasions

that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." <u>Drummond v. City of Anaheim</u>, 343 F.3d 1052, 1056 (9th Cir. 2003).

Morgan makes several arguments regarding the officers' alleged excessive force. Morgan appears to argue that any force was unnecessary, and therefore excessive, because she "was not resisting arrest" and was "compliant." <u>See</u> ECF No. 1-2, PageID # 12. But Morgan later contradicts her own assertion by acknowledging that she resisted the officers' orders in part because she "knew there was no reason for me to get arrested." <u>See</u> ECF No. 99-60, PageID #s 1962-65.

Moreover, Morgan's own video evidence shows conduct that Defendants say they perceived as threatening their safety. Morgan can be heard speaking to someone on the telephone and asking, "Is there anyone to call to come down here?" Three more times, Morgan can be heard asking the person to call others. Morgan then attempts to blow a conch shell, which the officers may have reasonably viewed as another attempt to call for reinforcements who might have overwhelmed the officers. Morgan does not dispute that the officers first used force to arrest her when she and the officers were near the kitchen area, where Morgan could potentially have reached for a knife or some other potentially dangerous object. <u>See</u> ECF No. 99-59, PageID # 1925.

25

Morgan complains that the officers caused her to fall to the ground, handcuffed her too tightly, tied her up, and kept her in a hot police vehicle for ten minutes.  This court examines each of these circumstances to determine whether excessive force was used.

### 1.  **Leg Sweep and Handcuffing.**

At the hearing on the present motion, Morgan indicated that Officer Kaina is the only Defendant she is suing for the "leg sweep" and actions to restrain her on the ground to handcuff her.  There is no dispute that Officer Kaina performed the leg sweep or that he used his body weight to hold Morgan down to be handcuffed.

This court does not agree with Kaina that he is entitled to summary judgment regarding the excessive force claim arising out of the leg sweep and initial handcuffing.  There are questions of fact as to whether the amount of force he used was reasonable under the circumstances.

According to Kaina, he was concerned that Officer Akina and another unidentified officer were in danger because Morgan was "extremely agitated," allegedly resisting arrest, and within reaching distance of knives and other potential weapons.  See ECF No. 99-59.  Kaina testified that the leg sweep was a controlled movement designed to "assist" Morgan to the ground without unnecessarily injuring her:

> I step to her left, outside of her left foot,
> and I assist by taking my left foot and
> placing it near her ankle and sliding it
> towards my right, which will in return throw
> her balance off and allow her to go to the
> ground.  But with Officer Akina and myself
> holding on to her arms, it wouldn't just drop
> her flat to the ground.  We would assist her
> to the ground.

ECF No. 99-59, PageID # 1931.  Notwithstanding identifying

individuals involved in this case, Kaina appears to be trying to

provide a textbook account of a properly executed leg sweep.  He

notably uses "will" and "would" as if talking about a

hypothetical situation.  He does claim to have "conducted the leg

sweep in accordance with my training," and says he "safely placed

Ms. Morgan on her stomach." ECF No. 60-23, PageID # 1180.

However, it is not clear whether "safely" refers to the officers'

safety or Morgan's safety.

Kaina says that, once Morgan was on the ground, she

curled up in a fetal position and tucked her arms under her body.

He says that he had to use his body weight to maneuver her into a

position that permitted her to be handcuffed.  ECF No. 60-23,

PageID # 1180.

Morgan does not dispute that she was agitated and

emotional.  But she argues that the amount of force used on her

was unreasonable.  The video of this part of the incident

indicates that she was taken down quickly.  Nothing in the video

suggests that Morgan had actually made aggressive motions toward

27

any officer right before the leg sweep.  Nor is there any evidence that any officer who feared Morgan might be reaching for a weapon could not simply have stepped out of Morgan's reach.  No threatening crowd appears to have gathered.  In short, it is not clear from the record that it was reasonable for Kaina to think he had to take physical action at that instant or in the form of a leg sweep.

Morgan's doctor indicated that Morgan suffered a bruise on her face, which may support Morgan's contention that her head was "slammed" into the ground and contradict Kaina's suggestion that Morgan was "allow[ed] to go to the ground."  Morgan also says that Kaina's application of his body weight to subdue her fractured one of her vertebrae, although Defendants contend that this was a preexisting injury.

Under these circumstances, a question of fact exists as to whether the force used by Kaina was reasonable.  Morgan's account, if accepted by a jury, may be sufficient for the jury to conclude that the amount of force used in performing the leg sweep and in handcuffing Morgan was unreasonable.  Conversely, the evidence may end up supporting a finding that the amount of force used by Kaina to subdue Morgan was reasonable under the circumstances.  This court leave this determination to the jury.

## 2.   Allegedly Tight Handcuffs.

Morgan complains that the metal handcuffs and later the flexicuffs were too tight.  "A series of Ninth Circuit cases has held that tight handcuffing can constitute excessive force." LaLonde v. Cnty. of Riverside, 204 F.3d 947, 960 (9th Cir. 2000) (citing Palmer v. Sanderson, 9 F.3d 1433 (9th Cir. 1993), and Hansen v. Black, 885 F.2d 642 (9th Cir. 1989)).  Defendants argue that the handcuffs were not unreasonably or excessively tight; they say that the officers checked both the metal handcuffs and the flexicuffs when Morgan complained that they were too tight. Defendants suggest that Morgan may have injured herself through her repeated struggles.

"Painful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal." Rodriguez v. Farrell, 280 F.3d 1341, 1352 (11th Cir. 2002); see also McDonald v. Kirkpatrick, Civ. No. C07-396RAJ, 2008 WL 552850, at *3 (W.D. Wash. Feb. 27, 2008); Startzell v. Velie, Civ. No. C04-5259RBL, 2005 WL 1645802, at *7 (W.D. Wash. July 12, 2005); West v. Eskes, Civ. No. C07-617RSL, 2008 WL 4283056, at *11 (W.D. Wash. Sept. 17, 2008).  "Indeed, non-excessive handcuffing techniques can cause pain."  Chambers v. Steiger, No. C14-1678-JCC-MAT, 2015 WL 9872531, at *8 (W.D. Wash. Oct. 29, 2015), report and recommendation adopted, Civ. No. C14-1678-JCC,

2016 WL 235764 (W.D. Wash. Jan. 20, 2016) (citing <u>Rodriguez</u>, 280 F.3d at 1352).

This court's role in deciding a motion for summary judgment is not to weigh the credibility of the evidence. <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 255 (at the summary judgment stage, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge"); <u>Balint v. Carson City</u>, 180 F.3d 1047, 1054 (9th Cir. 1999) (en banc) (the "court does not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial"). "The issue of tight handcuffing is usually fact-specific and is likely to turn on the credibility of the witnesses." <u>LaLonde</u>, 204 F.3d at 960.

Morgan clarified at the hearing that the only officer she is suing for putting on the metal cuffs too tightly is Akina. At the hearing, Morgan conceded that the metal handcuffs did not cause any permanent injury to her. However, this court recognizes that an injury need not be permanent to be actionable. The record does not clearly indicate how long Morgan was in the metal cuffs that she says caused her pain. It is undisputed that she told Akina they were too tight. The record precludes this court from ruling that there is no question of fact as to whether Akina put on the metal cuffs too tightly.

Morgan also clarified at the hearing before this court that she is suing Detective Ian Lee Loy for having ignored her complaints that the metal cuffs were too tight.  However, Morgan cites nothing in the record establishing that she complained directly to Lee Loy about the metal cuffs or that, even assuming Lee Loy heard the complaint, the circumstances were such that Lee Loy should have known that it fell to him, rather than to other officers in the vicinity, to check the metal cuffs.  This court therefore grants summary judgment to Lee Loy on this point.

Morgan says she is also suing Officer Akina for having put the flexicuffs on too tightly, and is suing Officers Manuel and Coe for having ignored her pleas to have the flexicuffs loosened.  Morgan claimed at the hearing that the flexicuffs caused her permanent injuries.  Her declaration states that she suffered nerve damage to her wrists.  ECF No. 99-1, PageID # 1505.  She also said that she feared losing her hands because they became swollen and numb; she characterizes the flexicuffs as tourniquets that were left on for several hours.  ECF No. 99-1, PageID # 1506.  Doctor Seto noted bruises on Morgan's wrists on the day of her arrest.  ECF No. 99-4, PageID # 1516.  These circumstances raise questions of fact as to whether Officer Akina put the flexicuffs on too tightly, whether Officers Manuel and Coe wrongfully ignored Morgan's complaints about the tightness of the flexicuffs, and whether the cuffs were so unreasonably tight

that they caused Morgan the claimed nerve damage to her wrists. The court therefore denies the motion for summary judgment to the extent Morgan claims excessive force based on the tightness of the flexicuffs.  That claim may proceed against Officers Akina, Manuel, and Coe.

### 3.  Being "Hogtied" and Carried to the Car.

Morgan claims that, after her arrest, she was "carried in a hogtied type of position" to the car in violation of her right to be free of excessive force.  Morgan identifies Moses Enoka Heanu as the person who told her that her "wrists and ankles were held together upside down" as she was carried by four men to the car.  ECF No.99-60, PageID # 1966.  Heanu says he witnessed four men carrying Morgan upside down and "hogtied," explaining that two men were holding Morgan's cuffed arms and that he could see that her ankles were tied together.  Heanu does not explicitly say that Morgan's wrists were tied to her ankles, and this court cannot tell from the statement that her "wrists and ankles were held together" whether Heanu was indicating that Morgan's wrists were held together and her ankles were separately held together.  See ECF No. 99-25, PageID #s 1569-70.

Detective Lee Loy says that, because Morgan refused to stand and ignored instructions to walk to the van, several officers carried Morgan to the van.  ECF No. 60-24, PageID # 1186.  Officer Akina explained that she and Kaina carried

Morgan to the van by her arms, with Sergeant Makua carrying Morgan's uncuffed legs.  ECF No. 99-59, PageID #s 1181-82.  Kaina says Morgan was not "hogtied" because her wrists and ankles were not tied together.  ECF No. 60-23, ECF No. 1180.

At the hearing on the present motion, Morgan said that she has no evidence that her wrists were tied to her ankles.  The court therefore treats the allegation that Morgan was "hogtied" as an allegation that metal handcuffs were on her wrists and that her ankles were tied together.  This court has earlier addressed the metal handcuffs.  Morgan does not claim any injury to her ankles.  The alleged "hogtying" does not appear to have resulted in a separate physical injury.  That is, Morgan identifies no physical injury relating specifically to the "hogtying"; nor does she say that the "hogtying" caused pain over and above any pain relating to the metal handcuffs.  This court therefore concludes that Morgan may not proceed with any excessive force claim relating to "hogtying," although the court is not ruling here that Morgan cannot introduce evidence that she was "tied up" when, at trial, she recounts what occurred.

This court now turns to her complaint that she was carried to the police van.

Upon questioning by this court, Morgan identified Akina, Makua, and Lee Loy as the persons she is suing for excessive force with respect to having been carried to the van.

33

Because Morgan points to no evidence that Lee Loy was one of the officers who carried her to the van after her arrest, the court grants him summary judgment on this point.

The officers who did carry Morgan to the van are entitled to summary judgment with respect to the excessive force claims relating to carrying Morgan to the van because there is no evidence that the act of carrying was unreasonable under the circumstances.

The admissible evidence indicates that two officers carried Morgan by her arms, while one or two officers carried her legs, which were either not tied or were tied together.  The officers say Morgan refused to walk to the van.  If her ankles were not tied together, it was her refusal to walk that forced the officers to carry her.  She cannot, in that event, sustain a claim against the officers for having carried her.  If her ankles were tied together, she may not have been able to walk on her own.  She identifies no injury flowing from any alleged tying of her ankles or from having been carried.  This court cannot itself identify any injury caused by her having been carried to the van, regardless of whether her ankles were tied together.

### 4.    Ten Minutes in a Hot Car.

Morgan says that an unknown officer drove her away from the beach and stopped at a road for ten minutes, where the officer left her in the van with the windows rolled up until

Officers Coe and Manuel arrived to take her to the police station in a different vehicle.  Even if Morgan has a claim against this unidentified Doe Defendant, he or she is entitled to summary judgment on any claim of excessive force arising out of having left Morgan in a hot car.

"Whereas an 'unnecessary exposure to heat" may cause a constitutional violation, being briefly confined in uncomfortable conditions, such as a hot patrol car, does not amount to a constitutional violation." Dillman v. Vasquez, Civ. No. 1:13-CV-00404 LJO, 2015 WL 881574, at *9 (E.D. Cal. Mar. 2, 2015) (citing Dillman v. Tuolumne Cnty., Civ. No. 1:13-cv-404-LJO-SKO, 2013 WL 1907379, at *15 (E.D. Cal. May 7, 2013)). See also Estmon v. City of New York, 371 F. Supp. 2d 202, 214 (S.D.N.Y. 2005) (finding no Fourth Amendment violation when plaintiff was held in hot police car for ten minutes but suffered no injuries); Glenn v. City of Tyler, 242 F.3d 307, 314 (5th Cir. 2001) (finding post-arrest detention for approximately one-half hour in unventilated police vehicle in sun not violative of Fourth Amendment).

Courts have recognized Fourth Amendment violations when plaintiffs were exposed to excessive heat for substantially longer periods of time than ten minutes. See, e.g., Burchett v. Kiefer, 310 F.3d 937, 945 (6th Cir. 2002) (considering arrestee held in police vehicle for three hours in 90-degree heat); Kassab

35

v. San Diego Police Dep't, 453 Fed. Appx. 747, 748 (9th Cir. 2011) (finding triable issue of fact regarding Fourth Amendment violation because claimant held for four hours in vehicle with an interior temperature of 115 degrees, suffered from heat stroke, had difficulty breathing, and almost passed out several times).

In contrast, Morgan demonstrates no injuries as a result of being kept in the van.  Nor does she show any other circumstances, such as the interior or exterior temperature, to create a triable issue of material fact as to whether being detained in the vehicle for ten minutes constituted excessive force in violation of her Fourth Amendment rights.  Summary judgment is granted to Defendants on this issue.

### 5.    Refusal to Render Medical Aid.

The Sixteenth Cause of Action asserts Defendants' refused to render medical aid.  See ECF No. 1-2, PageID # 22. Morgan was, however, repeatedly provided with medical care. Morgan first asked for and received medical assistance at Kawa Bay.  ECF No. 99-52, PageID # 1582.  According to a witness provided by Morgan herself, "She did get medical attention rather quickly."  ECF No. 99-52, PageID # 1582.  Then, at the police station, Morgan again demanded a medic.  ECF No. 99-60, PageID # 1980.  She was told that a medic would be called as soon as the booking process was completed.  ECF No. 60-20, PageID # 1168.  A

police officer called a medic for Morgan. ECF No. 99-60, PageID # 1980.

At the hearing in this case, Morgan clarified this claim saying that she is only asserting her claim of refusal to render medical aid against Officers Manuel and Coe for having ignored her pleas regarding injuries allegedly caused by the flexicuffs on the way to the police station. The court determines that there is a question of fact as to whether the officers callously ignored her pleas for medical attention while on the way to the police station. Morgan says her wrists were swelling and she feared she would lose her hands because the flexicuffs were acting as tourniquets during the two-hour ride. She says that she was crying out to the officers, pleading for them to do something about the cuffs. Although Morgan's claim that officers refused to render medical aid may in large regard duplicate her claim against Officers Manuel and Coe with respect to the flexicuffs allegedly being too tight, the court allows the medical aid claim to proceed.

### 6. Qualified Immunity.

Defendants assert that they have qualified immunity with respect to all of Morgan's claims. They say that "the officers are still entitled to qualified immunity because any right allegedly violated was not clearly established." ECF No. 100, PageID # 2087. Defendants fail to show that they are

entitled to qualified immunity with respect to the excessive
force claims that survive this ruling.

"[G]overnment officials performing discretionary
functions [are entitled to] a qualified immunity, shielding them
from civil damages liability as long as their actions could
reasonably have been thought consistent with the rights they are
alleged to have violated." Anderson v. Creighton, 483 U.S. 635,
638 (1987) (citations omitted); see also Richardson v. McKnight,
521 U.S. 399, 407-08 (1997).

The Supreme Court has set forth a two-pronged analysis
for determining whether qualified immunity applies. See Saucier
v. Katz, 533 U.S. 194, 201 (2001), overruled in part on other
grounds by Pearson v. Callahan, 555 U.S. 223 (2009).  On one
prong, the court considers whether the facts, "[t]aken in the
light most favorable to the party asserting the injury[,] . . .
show [that] the [defendant's] conduct violated a constitutional
right[.]" Saucier, 533 U.S. at 201.  Under this prong, this
court must decide whether the facts that Morgan alleges as the
basis for her § 1983 claim make out a violation of a
constitutional right. Pearson, 129 S. Ct. at 815-16; Bryan v.
MacPherson, 630 F.3d 805, 823 (9th Cir. 2010) ("First, we must
determine whether, taking the facts in the light most favorable
to the non-moving party, the officer's conduct violated a
constitutional right . . . .").

38

In addition, a plaintiff bears the burden of proving that the right allegedly violated was clearly established at the time of the violation.  <u>Saucier</u>, 533 U.S. at 201; <u>Scott v. Harris</u>, 550 U.S. 372, 377 (2007).  The "clearly establishes" prong requires a determination of whether the right in question was "clearly established . . . in light of the specific context of the case, not as a broad general proposition."  <u>Id.</u>; <u>Walker v. Gomez</u>, 370 F.3d 969, 974 (9th Cir. 2004).  The defendant bears the burden of establishing that the defendant reasonably believed the alleged conduct was lawful.  <u>See</u> <u>Sorrels v. McKee</u>, 290 F.3d 965, 969 (9th Cir. 2002); <u>Trevino v. Gates</u>, 99 F.3d 911, 916–17 (9th Cir. 1996).

The crucial question is whether the defendant could have reasonably but erroneously believed that his or her conduct did not violate the plaintiff's rights.  <u>Devereaux v. Abbey</u>, 263 F.3d 1070, 1074 (9th Cir. 2001).

The Ninth Circuit has reconstituted <u>Saucier</u>'s two prongs into three:

> Determining whether an official is entitled to summary judgment based on the affirmative defense of qualified immunity requires applying a three-part test.  First, the court must ask whether '[t]aken in the light most favorable to the party asserting the injury, [ ] the facts alleged show the officer's conduct violated a constitutional right?'  If the answer is no, the officer is entitled to qualified immunity.  If the answer is yes, the court must proceed to the next question:  whether the right was clearly

established at the time the officer acted.
That is, 'whether it would be clear to a
reasonable officer that his conduct was
unlawful in the situation he confronted.'  If
the answer is no, the officer is entitled to
qualified immunity.  If the answer is yes,
the court must answer the final question:
whether the officer could have believed,
'reasonably but mistakenly ... that his or
her conduct did not violate a clearly
established constitutional right.'  If the
answer is yes, the officer is entitled to
qualified immunity.  If the answer is no, he
is not."

Skoog v. Cnty. of Clackamas, 469 F.3d 1221, 1229 (9th Cir. 2006).

Whether an act is a violation of a federal right and
whether the right was clearly established at the time of the
violation are pure legal questions for the court.  See Martinez
v. Stanford, 323 F.3d 1178, 1183 (9th Cir. 2003).  Freedom from
the exercise of excessive force is a clearly established right
guaranteed by the Fourth Amendment.  Palmer v. Sanderson, 9 F.3d
1433, 1436 (9th Cir. 1993).  No police officer could have
reasonably believed a use of excessive force was permissible.
There are material issues of fact as to whether the officers did
use excessive force in some respects, but those issues do not
negate the clearly established nature of the law.  The court
cannot say as a matter of law that the officers are entitled to
qualified immunity with respect to the portions of the excessive
force claims that remain.

### B.    False Arrest, Warrantless Arrest, Kidnapping, and Detention.

In the Second, Third, Eleventh, and Fourteenth Causes of Action, Morgan alleges that she was falsely arrested and unlawfully seized without a warrant in violation of the Fourteenth Amendment of the United States Constitution and of Article I, section 7 of the Hawaii constitution.  She also claims that she was kidnapped and detained against her will.  ECF No. 1-2.

"To prevail on [a] § 1983 claim for false arrest and imprisonment, [a plaintiff] would have to demonstrate that there was no probable cause to arrest [the plaintiff]." Cabrera v. City of Huntington Park, 159 F.3d 374, 380 (9th Cir. 1998) (citation omitted).  Probable cause exists when, under the totality of circumstances known to the arresting officer, a reasonable person would have believed the suspect had committed a crime.  Dubner v. City & Cnty. of San Francisco, 266 F.3d 959, 966 (9th Cir. 2001).  "[I]f there was probable cause for any of the charges made . . . then the arrest was supported by probable cause, and the claim for false arrest fails." Lacy v. Cnty. of Maricopa, 631 F. Supp. 2d 1183, 1194 (D. Ariz. 2008) (citation omitted).

Morgan was found guilty beyond a reasonable doubt of simple trespass.  It stands to reason that the lower standard of probable cause was met.  See ECF No. 60-3, PageID # 1035; Kubanyi

41

v. Covey, 391 Fed. Appx. 620, 621 (9th Cir. 2010) (stating that plaintiff "cannot prevail on his Fourth Amendment false arrest claim because he was convicted of the offense for which the officers arrested him" (citing Cabrera v. City of Huntington Park, 159 F.3d 374, 380 (9th Cir. 1998)); Gowing v. Altmiller, 663 F.2d 820, 823 (9th Cir. 1981) (holding that conviction conclusively established existence of probable cause).

Morgan's simple trespass conviction also demonstrates that she was not unreasonably arrested without a warrant and that she was not kidnapped or improperly detained against her will. Defendants are entitled to summary judgment as to the Second Cause of Action (unlawful seizure), the Third Cause of Action (false arrest/false imprisonment), the Eleventh Cause of action (kidnapping), and the Fourteenth Cause of Action (improper detention).

### C.   Equal Protection Claims.

In the Fifth, Eighth, and Seventeenth Causes of Action, Morgan asserts a § 1983 claim for an alleged violation of the Equal Protection Clause, arguing that the officers singled her out for arrest based on her color and gender, as well as her religious, political, and cultural views, and committed a race-based hate crime.  There is no evidence relating to political or cultural discrimination.  At the hearing in this case, Morgan

abandoned her religious discrimination claims, narrowing these counts to race and gender discrimination.

"To prevail on an equal protection claim under the Fourteenth Amendment, a plaintiff must demonstrate that enforcement had a discriminatory effect and the police were motivated by a discriminatory purpose." Lacey v. Maricopa Cnty., 693 F.3d 896, 920 (9th Cir. 2012) (citing Rosenbaum v. City & Cnty. of S.F., 484 F.3d 1142, 1152 (9th Cir. 2007)). "To show discriminatory purpose, a plaintiff must establish that the decision-maker selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Pryor v. City of Clearlake, 877 F. Supp. 2d 929, 950 (N.D. Cal. 2012) (citing Rosenbaum, 484 F.3d at 1142, 1153)). To prove a discriminatory effect, "the claimant must show that similarly situated individuals . . . were not prosecuted." United States v. Armstrong, 517 U.S. 456, 465 (1996).

Morgan argues that she was arrested because she was a Caucasian woman. ECF No. 99-60, PageID #s 1989-90. Morgan does not show that a similarly situated person who was not a Caucasian woman was allowed to leave without being arrested. The record indicates that the critical difference between Morgan, on the one hand, and the other occupants who were not arrested was that Morgan was refusing to comply with the officers' directions and,

according to the officers, began to pose a threat to officer safety.  The record does not indicate that Lui or any other person at Kawa Bay communicated a refusal to abide by the officers' instructions.  Morgan's equal protection claim with respect to her arrest fails because, except with respect to Officer Manuel, she identifies no evidence that the officers' actions were motivated by her race or gender.  See United States v. Kidder, 869 F.2d 1328, 1336 (9th Cir. 1989).  Except with respect to Officer Manuel, Defendants are entitled to summary judgment as to the equal protection claims asserted in the Fifth, Eighth, and Seventeenth Causes of Action.

The court recognizes that the record differs with respect to Officer Manuel.  Morgan says that Officer Manuel told her, "You just like to fuck Hawaiians."  Manuel denies having said this.  The comment does not establish liability for wrongful arrest, given the existence of probable cause and the absence of evidence that Officer Manuel participated in the arrest. However, there are indeed issues of fact as to whether Manuel made the comment and, if he did, whether he was motivated by Morgan's race or gender to ignore Morgan's pleas that the flexicuffs be loosened and that her wrists be attended to. Although the comment was allegedly made at the police station, it is close enough in time to the period in which Manuel was

44

transporting Morgan to the police station to allow an inference as to Manuel's attitude during the transport.

At the hearing, Morgan agreed that this comment was intended to comment on her relationship with Lui, who is of native Hawaiian ancestry.  In this context, the comment could be interpreted as expressing a bias against inter-racial couples or against a Caucasian woman in a sexual relationship with a native Hawaiian.

The court views the facts in the light most favorable to Morgan and, given her pro se status, reads her claim liberally.  The court therefore denies the summary judgment motion to the extent it seeks summary judgment with respect to an equal protection claim asserted against Manuel based on his treatment of Morgan.  Assuming the flexicuffs were too tight, nothing in the record suggests that Officer Manuel routinely allows cuffs to remain on individuals in a manner that causes them to suffer.  There is a question of fact as to whether Manuel treated Morgan differently because she was a Caucasian woman.

### D.  Sexual Harassment and Discrimination.

In Fourth Cause of Action, Morgan asserts claims of sexual harassment and sexual discrimination under 42 U.S.C. § 3789d.  See ECF No. 1-2, PageID # 17.  That statute prohibits discrimination in connection with funds made available under 42 U.S.C. chapter 46, relating to Justice System Improvement.  See

45

42 U.S.C. § 3789d(c)(1) ("No person in any State shall on the
ground of race, color, religion, national origin, or sex be
excluded from participation in, be denied the benefits of, or be
subjected to discrimination under or denied employment in
connection with any programs or activity funded in whole or in
part with funds made available under this chapter."). Morgan
does not allege that any funds disbursed pursuant to chapter 46
were used in a discriminatory fashion against her. Accordingly,
summary judgment is granted in favor of Defendants with respect
to the § 3789d claim.

### E.   Denial of Request for Female Officer.

In the Ninth Cause of Action, Morgan alleges that her
request for a female officer to be present was denied. Given the
facts presented to the court, this cause of action appears to be
based on Morgan's request that a female officer be present while
Morgan was being booked. The claim appears to assert a violation
of her Fourth Amendment right to be free of an unreasonable
seizure. The court grants summary judgment in favor of
Defendants on this claim.

Morgan says she asked that a female officer be present
during her booking process at the police station because she was
uncomfortable being alone with Officers Manuel and Coe after
Manuel allegedly brushed his arm against her breasts. See ECF
No. 99-60, PageID # 1977. But Morgan identifies no legal

authority for the proposition that a female officer had to be present during her booking process at the police station.  There are no facts in the record indicating that any privacy concerns were implicated during booking such that an officer of the same sex might have been required.  Morgan does not say that she was asked to take her clothes off, watched in the bathroom, or even patted down during the booking process at the police station. While Morgan says she was "uncomfortable" being around Manuel, she does not explain why her alleged discomfort could not be addressed by having male officers other than Manuel around her while she was being booked at the police station.  On the present record, she does not make out a Fourth Amendment violation relating to the absence of a female officer.

Indeed, Morgan does not even allege that she was left alone with Manuel and Coe at the station.  To the contrary, Dennis Martin, a sheriff who was at the police station at the time, says he saw Morgan pulling on her cuffs, inflicting pain on herself.  ECF No. 60-35, PageID # 1275.  This indicates the presence of another person at the station who could have stepped in if Manuel or Coe acted improperly during booking.

Summary judgment is granted in favor of Defendants as to the claim in the Ninth Cause of Action that Defendants violated the Fourth Amendment by refusing to have a female officer present during the booking process at the police station.

### F.   Claims Against County.

In the Tenth Cause of Action, Morgan asserts that the
County of Hawaii is liable under 42 U.S.C. § 1983 for having
failed to properly train its police officers.  See ECF No. 1-2,
PageID # 20.  To prevail against a municipality such as the
County of Hawaii on a § 1983 claim, a plaintiff must prove that:

> (1) the constitutional tort was the result of
> a longstanding practice or custom which
> constitutes the standard operating procedure
> of the local government entity; (2) the
> tortfeasor was an official whose acts fairly
> represent official policy such that the
> challenged action constituted official
> policy; or (3) an official with final
> policy-making authority delegated that
> authority to, or ratified the decision of, a
> subordinate.

Price v. Sery, 513 F.3d 962, 966 (9th Cir. 2008) (quotation marks
and citation omitted).  In other words, municipal liability under
§ 1983 may be premised on an officially promulgated policy, a
custom or persistent practice, deliberately indifferent training
that is the proximate cause of the violation of the plaintiff's
federally protected rights, or a single decision by an official
with final decision-making authority.  See City of Canton v.
Harris, 489 U.S. 378 (1989); St. Louis v. Praprotnik, 485 U.S.
112 (1988); Pembaur v. Cincinnati, 475 U.S. 469 (1986); Monell v.
N.Y. City Dep't of Soc. Servs., 436 U.S. 658, 695 (1978).

In addition, a claim based on a custom or policy must
be based on a custom or policy that is the "moving force behind

48

the constitutional violation." Dietrich v. John Ascuaga's

Nugget, 548 F.3d 892, 900 (9th Cir. 2008) (quoting Monell, 436

U.S. at 694); see also Trevino v. Gates, 99 F.3d 911, 918 (9th

Cir. 1996) ("Liability for improper custom may not be predicated

on isolated or sporadic incidents; it must be founded upon

practices of sufficient duration, frequency and consistency that

the conduct has become a traditional method of carrying out

policy.").

"[T]he inadequacy of police training may serve as the

basis for § 1983 liability only where the failure to train

amounts to deliberate indifference to the rights of persons with

whom the police come into contact." City of Canton, 489 U.S. at

388.

With respect to Morgan's allegation of inadequate

police training, the County submits the declaration of the Police

Chief of the Hawaii Police Department. See ECF No. 60-29.

According to the Chief, every officer is required to undergo and

complete a training program that includes portions on probable

cause and the reasonable use of force. See ECF No. 60-29, PageID

# 1257.

In addition to this training, each officer allegedly

receives in-service training on these subjects, and must comply

with the Department's General Orders setting forth its policies

regarding arrest. See ECF No. 60-29, PageID # 1257. General

49

Order No. 606 includes applicable arrest statutes and provides, "In making arrests, it shall be the policy of the Hawai'i Police Department that members shall strictly observe all laws, policies and procedures prescribed by the department, the United States Constitution, Hawai'i Revised Statutes and judicial rulings." ECF No. 60-27, PageID # 1232.  The General Order adds, "No person shall be subjected to more restraint than is necessary and proper for his arrest and detention."  ECF No. 60-27, PageID # 1234. With regard to the use of handcuffs, General Order No. 606 instructs that "[r]estraints shall be secured but not to the extent to cause the arrested person injury, or unreasonable discomfort."  ECF No. 60-27, PageID # 1236.

With regard to the use of force, General Order No. 804 provides, "It shall be the policy of the Hawai'i Police Department that members shall use only the force reasonably necessary to accomplish lawful objectives, while protecting the lives of officers and citizens alike."  ECF No. 60-28, PageID # 1245.  The order further states, "In accordance with Section 803-7, Hawai'i Revised Statutes, as amended, in all cases where the person arrested refuses to submit or attempts to escape, such degree of force may be used as is necessary to compel the person to submission."  ECF No. 60-28, PageID # 1247.

The County thus submits evidence of a written policy that requires officers to undergo training to use only the force

50

reasonably necessary to accomplish lawful objectives and prohibits excessive force.  While Morgan submits evidence supporting her allegation that officers violated County policy, she fails to show that the alleged violation was the product of an official County policy or County custom of ignoring the written policy.  In fact, no evidence suggests any custom or practice of either following or flouting the written policy.

Nor is there evidence that the challenged action was taken or ratified by an official with "final policymaking authority."  See Pembauer v. Cincinnati, 475 U.S. 469, 482-483 (1986).

Accordingly, the County of Hawaii is entitled to summary judgment as to the Tenth Cause of Action.

### G.   First Amendment Claim.

In the Sixth Cause of Action, Morgan asserts that the officers arrested her in retaliation for her exercise of First Amendment rights.  See ECF No. 1-2, PageID # 18.  At the hearing on the present motion, Morgan said she was asserting this claim against Akina, the County of Hawaii, and the Hawaii Police Department.[1]

---

[1]Claims against a municipality and its respective police department are treated as claims against the municipality, as the police department is not an entity separate from the municipality.  See Fisher v. Kealoha, 869 F. Supp. 2d 1203, 1214 (D. Haw. 2012) (dismissing police department because it was not independent entity subject to suit in addition to municipality); Dowkin v. Honolulu Police Dep't, Civ. No. 10-00087 SOM/LEK, 2010

The First Amendment, made applicable to the states by the Fourteenth Amendment, prohibits the burdening of freedom of speech.  See Long Beach Area Peace Network v. City of Long Beach, 574 F.3d 1011, 1020-21 (9th Cir. 2009) (quoting U.S. Const. amend. I); Prete v. Bradbury, 438 F.3d 949, 961 (9th Cir. 2006). To establish a First Amendment retaliation claim, Morgan must prove that (1) Defendants' actions "would chill a person of ordinary firmness from future First Amendment activity," and (2) "the officers' desire to chill [her] speech was a but-for cause of their allegedly unlawful conduct."  See Ford v. City of Yakima, 706 F.3d 1188, 1193 (9th Cir. 2013) (citations and quotations omitted).  "A plaintiff 'may not recover merely on the basis of a speculative 'chill' due to generalized and legitimate law enforcement initiatives."  Oester v. Datan, No. 6:12-CV-0152-TC, 2014 WL 4446062, at *4 (D. Or. Sept. 9, 2014) (quoting Gibson v. United States, 781 F.2d 1334, 1338 (9th Cir. 1986)).  "Rather, [the plaintiff] must adequately establish 'discrete acts' of police conduct that were 'directed solely at silencing' him" or her.  Oester, 2014 WL 4446062, at *4 (quoting Gibson, 781 F.2d at 1338).  Ninth Circuit law clearly establishes the right to verbally challenge the police, Mackinney v. Nielsen, 69 F.3d 1002, 1007 (9th Cir. 1995).  The police may not exercise

WL 4961135, at *3 (D. Haw. Nov. 30, 2010) (same).  Accordingly, to the extent there are duplicative claims against the Hawaii Police Department and the County of Hawaii, the court treats the claims as asserted against only the County.

"the awesome power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment." Duran v. City of Douglas, 904 F.2d 1372, 1378 (9th Cir. 1990) (holding that officer lacked probable cause to stop individual for obscene gesture and words directed to officer).

Akina and the County of Hawaii cannot be said to have violated Morgan's First Amendment rights simply by executing the writ of possession issued by the state court.  While Morgan argued in the court proceedings that she was lawfully exercising native Hawaiian rights, she cannot, as she herself conceded at the hearing on this motion, challenge the state court order in this proceeding.  In short, Morgan's speech cannot be said to have been wrongfully chilled by the enforcement of a state court order.

Morgan appears to be trying to raise a genuine issue of fact as to whether Akina's possible desire to end Morgan's protestations was a but-for cause of her arrest.  At the hearing in this case, Morgan suggested that her First Amendment rights were violated because she was arrested for having verbally challenged the officers' directions to pack up her home.  See Hartman v. Moore, 547 U.S. 250, 256 (2006) ("the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out").  Defendants

53

say they are entitled to summary judgment because Morgan was arrested for violating a state court order and resisting the officers.  See Kubanyi v. Covey, 391 Fed. Appx. 620, 621 (9th Cir. 2010) (holding that plaintiff's First Amendment right to free speech was not violated because officers arrested him to ensure safety in face of plaintiff's disorderly conduct, not in retaliation for his speech (citing Dietrich v. John Ascuaga's Nugget, 548 F.3d 892, 896, 900-02 (9th Cir. 2008)).  Akina also contends she has qualified immunity with respect to the First Amendment claim.

There is no dispute that Morgan was told that she had two hours to pack up her stuff and leave.  Nor is there any dispute that Morgan was arrested before the two hours were up, while loudly challenging the officers' directions.  Even assuming that Akina was retaliating against Morgan for her exercise of free speech rights, Akina has qualified immunity with respect to the claim.

The court puts aside the issue of whether, in pleading a claim of retaliation for her exercise of First Amendment rights, Morgan pleads a cognizable constitutional violation.  See Hartman v. Moore, 547 U.S. at 256.  Even if Morgan satisfies that prong of the qualified immunity analysis, Morgan does not satisfy the "clearly established" prong.

The "clearly established" prong of the analysis requires this court to determine whether the right, as defined by the facts of the case, was clearly established at the time.  <u>See Skoog v. Cnty. of Clackamas</u>, 469 F.3d 1221, 1235 (9th Cir. 2006).  It was not.

In June 2012, only months before Morgan's arrest, the Supreme Court held that an alleged First Amendment right to be free from retaliatory arrest for speech when the arrest is supported by probable cause was not clearly established.  In <u>Reichle v. Howards</u>, 132 S. Ct. 2088, 2093 (2012), the Supreme Court stated, "This Court has never recognized a First Amendment right to be free from a retaliatory arrest that is supported by probable cause."  For purposes of a qualified immunity analysis, the Supreme Court noted:

> we have previously explained that the right allegedly violated must be established, not as a broad general proposition, but in a "particularized" sense so that the "contours" of the right are clear to a reasonable official.  Here, the right in question is not the general right to be free from retaliation for one's speech, but the more specific right to be free from a retaliatory arrest that is otherwise supported by probable cause.  This Court has never held that there is such a right.

<u>Reichle</u>, 132 S. Ct. at 2094 (quotation marks and citations omitted).

Akina has qualified immunity with respect to Morgan's First Amendment claim, as there was no clearly established law at

the time protecting Morgan from an allegedly retaliatory arrest given the probable cause to arrest her.  Id.; see also Skoog, 469 F.3d at 1235 ("even assuming [the officer's] primary motivation for seizing Skoog's still camera was to retaliate for Skoog's exercise of his First Amendment rights, he violated no clearly established law because probable cause existed for the search").

Because Morgan provides no evidence that the County of Hawaii should be liable for Akina's conduct, the County is also entitled to summary judgment for the reasons set forth in the municipal liability section above.  Summary judgment is granted in favor of Defendants with respect to the First Amendment claim.

### H.   42 U.S.C. § 1986 Conspiracy Claim.

In the Thirteenth Cause of Action, Morgan asserts a violation of 42 U.S.C. § 1986, alleging, "Officers conspired to falsify and collaborate on making of use of force reports, failed to require reports from offending officers, allowed alterations and tampering of evidence; also hiding video footage of incriminating events during incident."  ECF No. 1-2, PageID # 21.

In 42 U.S.C. § 1986, Congress provided:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by

56

> reasonable diligence could have prevented . .
> . . But no action under the provisions of
> this section shall be sustained which is not
> commenced within one year after the cause of
> action accrued.

To assert a claim under § 1986, Morgan must therefore show a failure to stop a violation of 42 U.S.C. § 1985.

Morgan fails to identify which subsection(s) of § 1985 she is proceeding under[2] but she appears to be asserting that Defendants violated the second clause of § 1985(2).  Under 42 U.S.C. § 1985(2), parties may be liable if they

---

[2]Section 1985 contains discrete substantive clauses. Section 1985(1) concerns preventing an officer of the United States from performing his or her duties.  The first clause of section 1985(2) concerns conspiring to obstruct justice in the federal courts, or to intimidate a party, witness, or juror in connection therewith.  The second clause of § 1985(2) provides a cause of action if:

> two or more persons conspire for the purpose of
> impeding, hindering, obstructing, or defeating, in any
> manner, the due course of justice in any State or
> Territory, with intent to deny any citizen the equal
> protection of the laws, or to injure him or his
> property for lawfully enforcing, or attempting to
> enforce, the right of any person, or class of persons,
> to the equal protection of the laws.

The first clause of § 1985(3) provides a cause of action for a private conspiracy to deny equal protection of the laws.  The second clause of § 1985(3) provides a cause of action for a conspiracy

> for the purpose of preventing or hindering the constituted
> authorities of any State or Territory from giving or
> securing to all persons within such State or Territory the
> equal protection of the laws.

The third clause of § 1985(3) provides a cause of action for a conspiracy to interfere with federal elections.

> conspire for the purpose of impeding,
> hindering, obstructing, or defeating, in any
> manner, the due course of justice in any
> State or Territory, with intent to deny to
> any citizen the equal protection of the laws,
> or to injure him or his property for lawfully
> enforcing, or attempting to enforce, the
> right of any person, or class of persons, to
> the equal protection of the laws.

However, to state a claim under the second clause of § 1985(2),

Morgan must show an invidiously discriminatory, racial, or class-

based animus.  See Bretz v. Kelman, 773 F.2d 1026, 1029-30 (9th

Cir. 1984) (en banc).

Morgan has not submitted any evidence demonstrating

that at least two officers conspired out of race-based animus to

arrest her or falsified police reports to cover up the injuries

she allegedly sustained.  ECF No. 99-60, PageID # 1988.  As noted

above, except with respect to Manuel, Morgan raises no issue of

fact as to whether the officers' conduct was motivated by race.

At the hearing in this case, Morgan identified Akina, Kaina,

Makua, Lee Loy, and Coe as Defendants sued as conspirators.  As

she is not pursuing Manuel with respect to the conspiracy count,

there is no evidence that any Defendant named with respect to the

alleged conspiracy has a race-based animus towards Morgan.

Moreover, Morgan's only support for her assertion that

the reports were falsified is that they were consistent with each

other.  Notably, she does not identify specific falsehoods.  ECF

No. 99-60, PageID # 1988 ("And the falsehoods, especially like

between Coe and Manuel, they make statements--they're both making false statements as if they conspired to be able to make these statements of situations that didn't exist or did not occur."). Under these circumstances, no § 1986 claim may be maintained based on an alleged violation of § 1985(2), and Defendants are entitled to summary judgment with respect to the Thirteenth Cause of Action.

Given the court's grant of summary judgment with respect to Morgan's conspiracy claim, the court need not reach other defenses to it, such as the statute of limitations, raised in Defendants' Answer.

## I.   Emotional Distress.

The Fifteenth Cause of Action bears the title of "negligent infliction of emotional distress."  Morgan alleges that she "has been diagnosed with Emotional and Post Traumatic Stress, Depression and Social Anxiety directly related to the incident and must receive counseling and treatment."  ECF No. 1-2, PageID # 22.  Morgan alleges that her emotional distress was caused by police brutality and her witnessing of "Crimes against humanity, war crimes," and violation of native-Hawaiian rights. Id.

To maintain a claim for negligent infliction of emotional distress under Hawaii law, Morgan must establish: (1) that Defendants engaged in negligent conduct; (2) that she

59

suffered serious emotional distress; and (3) that Defendants'
negligent conduct was a legal cause of her serious emotional
distress.  Mukaida v. Hawaii, 159 F. Supp. 2d 1211, 1239 (D. Haw.
2001).  A cognizable claim for negligent infliction of emotional
distress under Hawaii law also requires a physical injury to
either a person or property.  Id.; Calleon v. Miyagi, 76 Haw.
310, 320, 876 P.2d 1278, 1288 (1994).

Defendants argue that they are entitled to summary
judgment for two reasons.  First, Defendants argue that the claim
fails because the force they used was reasonable.  See ECF No.
59-1, PageID # 923.  Defendants then argue that, under Hawaii
law, nonjudicial government officials have a qualified or
conditional privilege with respect to tortious actions taken in
the performance of their public duties, unless the plaintiff can
establish that the official's conduct was motivated by malice.
See ECF No. 59-1, PageID # 923 (citing Wong v. City & Cnty. of
Honolulu, 333 F. Supp. 2d. 942, 958-59 (D. Haw. 2004); Medeiros
v. Kondo, 55 Haw. 499, 504 (1974)).  Hawaii courts define
"malice" as "the intent, without justification or excuse, to
commit a wrongful act[,]" "reckless disregard of the law or of a
person's legal right[,]" and "ill will; wickedness of heart."
See Awakuni v. Awana, 115 Haw. 126, 141, 165 P.3d 1027 (2007).
Because malice involves intent, reckless disregard, or ill will,
Defendants argue that "the malice requirement is incompatible

60

with a claim based upon negligence."  ECF No. 59-1, PageID #s 923-24 (citing <u>Tokuda v. Calio</u>, Civ. No. 13-00202 DKW-BMK, 2014 WL 5580959, at *10 (D. Haw. Oct. 31, 2014); <u>Bartolome v. Kashimoto</u>, Civ. No. 06-00176BMK, 2009 WL 1956278, at *2 (D. Haw. June 26, 2009); and <u>Tagawa v. Maui Publ'g, Co.</u>, 50 Haw. 648, 653, 448 P.2d 337, 341 (1968)).

This court begins its analysis by questioning Defendants' contention that a finding of malice is incompatible with a negligence-based claim.  The higher burden of proof with respect to malice does not necessarily preclude a claim based on negligence.  <u>See</u> <u>Long v. Yomes</u>, Civ. No. 11-00136 ACK, 2011 WL 4412847, at *7 (D. Haw. Sept. 20, 2011) ("[C]onduct performed with 'reckless disregard of the law or of a person's legal rights' may be negligent, even though negligent conduct often does not involve malice." (citations omitted)).

In <u>Costales v. Rosete</u>, 133 Haw. 453, 331 P.3d 431 (2014), a former ward of the Office of Youth Services ("OYS"), filed a complaint against the State of Hawaii, the OYS, and several OYS officials in their individual and official capacities, asserting several negligence-based claims, including a claim for negligent infliction of emotional distress.  Costales alleged that the defendants were not protected by qualified immunity because they had acted with malice and/or for an improper purpose.  <u>Id.</u> at 456-57, 331 P.3d at 434-35.

A jury found in favor of the plaintiff on the negligence-based counts.  Id. at 464, 331 P.3d at 442.  The circuit court granted a new trial because of an irreconcilable conflict in the jury's answers on the special verdict form.  Id. at 464, 331 P.3d at 442.  On appeal, the Hawaii Supreme Court held that the jury instructions were defective because they failed to instruct the jury as to the circumstances in which the OYS officials could be liable in their individual versus official capacities for the general damage amounts:

> To defeat a public official's claim of qualified immunity, the burden is on the plaintiff to adduce "clear and convincing proof that [the public official] defendant was motivated by malice and not by an otherwise proper purpose."  Id.  "If it is determined that [the individual defendant] was acting within the scope of his employment as a public official, then he can be held liable for general, special, and punitive damages (1) if he maliciously exercised his official discretion, or (2) if he maliciously committed a tort against plaintiffs . . . ."  Kajiya v. Dep't of Water Supply, 2 Haw. App. 221, 227, 629 P.2d 635, 640 (App.1981) (citations and footnote omitted).

The Hawaii Supreme Court instructed the trial court on remand to limit the "issues of the new trial to the allocation of fault and of general and special damages among the defendants, with an instruction to be given to the jury regarding when a State employee can be personally liable due to malice or improper purpose."  Id. at 471, 331 P.3d at 449.  The new trial to allocate damages did not exclude damages relating to the

62

negligent infliction of emotional distress claim.  That is, the Hawaii Supreme Court did not articulate a conflict between a negligence claim and the burden on the plaintiff to establish malice.

Similarly, in <u>Sanchez v. County of Kaua'i</u>, No. CAAP-14-0000903, 2015 WL 4546861 (Haw. Ct. App. July 28, 2015), the plaintiff filed a complaint against the County of Kauai, its police department, and certain officers, asserting, among other things, negligent hiring, training, supervision, and retention, and negligent investigation.  2015 WL 4546861, at *1 n.2.  The trial court granted the defendants' motion for summary judgment on the basis of qualified immunity.  <u>Id.</u>  Hawaii's Intermediate Court of Appeals vacated the trial court's order, concluding that there were genuine issues of material fact as to the existence of malice.  <u>Id.</u> at *4.  Although the appellate court did not directly address the issue, it did not rule that the negligence-based claims were precluded as incompatible with malice.

Defendants do not establish that Hawaii law precludes a claim for negligent infliction of emotional distress against a public official.  Hawaii law only requires a claimant to overcome an official's qualified immunity by proving the official's malice, including with respect to allegedly negligent conduct.

Morgan claims that she suffered emotional distress arising out of police brutality.  <u>See</u> ECF No. 95-1.  There is a

question of fact as to whether Officer Kaina acted with malice with respect to his use of force in subduing Morgan.  There is also a question of fact as to whether Officers Manuel and Coe acted with malice in allowing Morgan to suffer from allegedly overly tight flexicuffs that Morgan says caused wrist injuries.

However, Defendants are entitled to summary judgment as to what Morgan labels "Count II" of the Fifteenth Cause of Action, which alleges that Morgan suffered emotional distress when she was "[f]orced to witness ongoing Crimes against humanity, war crimes, ongoing violations of the Apology Resolution, and blatant loss of Appurtenant and cultural rights of Hawaiians."  ECF No. 60-2, PageID # 953.  This "forced to witness" claim is mere argument.

### J.   Assault and Battery.

Part of Morgan's First Cause of Action asserts an assault and battery.  At the hearing on the present motion, Morgan indicated that her assault and battery claims are based on the same conduct at issue in the excessive force claims.  A person commits the common law tort of assault if he or she acts with intent to cause another a nonconsensual harmful or offensive contact or apprehension thereof, and the other person apprehends imminent contact.  See Mukaida v. Hawaii, 159 F. Supp. 2d 1211, 1223 (D. Haw. 2001) (citations omitted).  A person commits the common law tort of battery if he or she acts with intent to cause

64

a nonconsensual harmful or offensive contact, or apprehension thereof, and the contact occurs.  Id.; see also Williams v. Aona, 121 Haw. 1, 13, 210 P.3d 501, 513 (2009).  A bodily contact is offensive "if it offends a reasonable sense of personal dignity." Restatement (Second) of Torts § 19 (1965).  As discussed above, in addition to proving the elements of the assault and battery claims, Morgan must prove that Defendants' conduct was malicious, as the police officers are government officials.

Morgan raises a genuine issue of fact as to whether Officer Kaina assaulted and battered Morgan when he did a leg sweep of her and used the weight of his body to control her, allegedly causing a fracture of her vertebrae.  She also raises a genuine issue of fact as to whether Officer Akina assaulted and battered Morgan by placing the metal cuffs and/or the flexicuffs on too tightly, allegedly causing wrist injuries.  Under these circumstances, summary judgment is denied to the extent the assault and battery claims are asserted against Kaina and Akina, but otherwise granted.

### K.   Haw. Rev. Stat. § 803-6.

In the Sixth Cause of Action, Morgan asserts that the officers violated Haw. Rev. Stat. § 803-6, which provides:

> (a) At or before the time of making an arrest, the person shall declare that the person is an officer of justice, if such is the case.  If the person has a warrant the person should show it; or if the person makes the arrest without warrant in any of the

cases in which it is authorized by law, the
person should give the party arrested clearly
to understand for what cause the person
undertakes to make the arrest, and shall
require the party arrested to submit and be
taken to the police station or judge.  This
done, the arrest is complete.

At the hearing on the present motion, Morgan agreed to withdraw
her section 803-6 claim.  However, evidence of the alleged
statutory violation might still be relevant to other claims that
remain in issue.

### L.   Haw. Rev. Stat. § 92F-14.

In the Seventh Cause of Action, Morgan asserts that
Defendants violated her right to privacy.  She says that the
Hawaii Police Commission violated section 92F-14(1) of Hawaii
Revised Statutes, which states that an individual has a
significant privacy interest in his or her medical, psychiatric,
and psychological history.

Morgan filed a complaint with the Police Commission
that was listed in the public agenda for a meeting on March 15,
2013, as "HPC 12-47: Complainant alleged that when officers
executed a writ of possession and ejection, they caused her
bodily injury and emotional distress, and an officer taunted and
laughed at her."  ECF No. 60-32, PageID # 1270.  Morgan says
that, when she went to the meeting, she was forced to fill out
her name and complaint number on a sign up sheet.  Morgan points
to an example of such a sheet, but not the one she signed.  <u>See</u>

ECF No. 99-38, PageID # 1605.  The minutes for the meeting
indicate that, with respect to HPC 12-47, Moses Inoka Heanu
testified "that when Kittrena was handcuffed, she wasn't
struggling."  ECF No. 60-21, PageID # 1172; see also ECF No. 60-
22, PageID #s 1174-75.  Morgan says the combination of the
agenda, sign in sheet, and Inoka's testimony constituted an
improper publication by Defendants of her private psychiatric
diagnosis.  ECF No. 99-60, PageID # 1983.  Morgan also accuses
Defendants of leaking private medical information about her to
local media.  ECF No. 1-2, PageID #s 18-19.

There is no indication that Morgan's private medical
information was improperly released by the Hawaii Police
Commission through the combination of documents.  The agenda
generally discusses the claims she made against the police and
the resulting harm.  That Morgan may have signed her name on a
sign-in sheet along with the complaint number did nothing more
than identify the person making the claim.  Morgan's own
witnesses identified her by name at the hearing.  Finally, the
newspaper article Morgan points to in the West Hawaii Herald
Tribune only reports that Morgan's complaint alleged that the
police had "caused her bodily injury and emotional distress.  The
complaint also notes her disagreement with her treatment
following arrest."  ECF No. 99-74, PageID # 2047.  The West
Hawaii Today article stated, "The Hawaii County Police Commission

on Friday delayed again a decision on a woman's complaint that officers physically and mentally injured her when she was arrested during the Oct. 25 eviction of Abel Lui and others from Kawa Bay in Ka'u." ECF No. 99-74, PageID # 2049.

To the extent Morgan is relying on the reference to her emotional distress as a wrongful disclosure of her medical information, Morgan misapprehends her privacy rights. The challenged reference simply noted her claim that Defendants had caused her emotional distress. The existence of an emotional distress claim is not private medical information. One cannot both lodge an emotional distress claim and maintain that the existence of the claim or the existence of the underlying emotional distress may not be disclosed. The claimant herself discloses the emotional distress in making the claim.

There is no admissible evidence supporting Morgan's allegation that Defendants intentionally leaked Morgan's confidential information to local news media. The articles themselves present no evidence to that effect.

Summary judgment is granted in favor of Defendants as to the Seventh Cause of Action.

### M. Life, Liberty, and Pursuit of Happiness.

The Fourteenth Cause of Action asserts a deprivation of life, liberty, and the pursuit of happiness. See ECF No. 1-2, PageID # 22. To the extent it asserts a violation of the

Declaration of Independence, the claim is not cognizable.  The Declaration of Independence is an important historical document, but it is not law.  See, e.g., Minyard v. Walsh, No. ED CV 13-00110 DSF, 2014 WL 1029835, at *4 (C.D. Cal. Mar. 17, 2014). Construed liberally, the claim is at best a repetition of other claims addressed above.  Summary judgment is granted in favor of Defendants with respect to the Fourteenth Cause of Action.

## V.        CONCLUSION.

The court grants Defendants' motion for summary judgment in part and denies it in part.  Summary judgment is granted on all of Morgan's claims except the following: 1) Morgan's excessive force claim against Kaina for his leg sweep and use of body weight in subduing Morgan; 2) Morgan's excessive force claims against Akina relating to the allegedly tight metal handcuffs and against Akina, Manuel, and Coe relating to the allegedly tight flexicuffs; 3) Morgan's excessive force claim against Manuel and Coe for having allegedly refused to render medical aid with respect to injuries caused by the allegedly tight flexicuffs; 4) Morgan's equal protection claim against Manuel with respect to his alleged refusal to loosen the flexicuffs or provide Morgan with medical aid to address injuries allegedly caused by tight flexicuffs; 5) Morgan's negligent infliction of emotional distress claims against Kaina with respect to his use of force in subduing Morgan and against Manuel

69

and Coe with respect to their alleged allowance of overly tight flexicuffs; 6) Morgan's assault and battery claim against Kaina for his use of force in subduing Morgan and against Akina for allegedly putting on the metal cuffs and/or the flexicuffs too tightly.

The court understands that Morgan has unsuccessfully attempted to get legal representation in this action. Because trial may be very challenging for Morgan, the court encourages her to attempt to seek counsel again. Morgan may find it helpful to share the present order with the attorneys she contacts.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, March 29, 2016.



/s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge

Morgan v. County of Hawaii, et al., Civ. No. 14-00551 SOM/BMK; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT